# COURT OF ERRORS AND APPEALS.

NOVEMBER TERM, 1852.

---

ALFRED WOODWARD, appellant, and CORNELIUS WOODWARD and *al*, respondents.

The case in Chancery is reported *ante*, 127.

*W. Halsted* and *P. D. Vroom* for the appellant.

*Vredenbergh* and *J. F. Randolph* for the respondents.

POTTS, J. Anthony Woodward died on the 9th of May, 1840. He had been twice married. By his first wife he left one son, James Woodward, who is the father of the complainant. By his second wife, Caroline, who survives him, he left five children, Keziah, Elizabeth, Hannah Ann, William and Anthony. The bulk of his estate, after payment of debts, consisted of the homestead farm worth $10,000 to $15,000. He left no will. But some days after his death a deed was found in a private drawer of his desk, bearing date the 19th day of August, 1825, signed and sealed by him, and drawn in the ordinary form of a deed of bargain and sale, purporting, for and in consideration of the sum of $400, to convey the said homestead farm to his grandson, the complainant in this cause.

The complainant, claiming this property under this deed, brought an action at law to obtain possession of the farm from the widow, and having failed in that, filed his bill in Chancery to have the possession delivered up to him together with the

title deeds and an account for rent since the death of his grand-father, and alleging that this deed was in the nature of a settle-ment, and had been executed under peculiar circumstances, which are set out in the bill, and that it had been delivered to him by his grandfather soon after the time it bears date and be-fore the second marriage, and had been left by him in the hands of the grantor for safe keeping, he, the complainant, being at that time a minor.  To this bill the widow and children by the second marriage filed an answer; and subsequently the com-plainant filed a supplemental bill against the administrators of Anthony Woodward for an injunction to restrain them from selling any part of the said farm for the payment of debts, which was granted, and the administrators filed their answer to said supplemental bill.  Replications were put in, a large amount of testimony was taken; and the cause having been heard before the Chancellor, he was of opinion that the complainant should be left to his remedy at law, and ordered the injunction to be dissolved and the bill dismissed; and thereupon this appeal was taken.

Two questions are presented to the consideration of this Court. 1. Was this a proper case for a decree in Chancery upon the merits?  And 2d. If so, is the complainant entitled to the relief he prays?

1. Upon the first point, I think the Chancellor erred in dis-missing the bill on the ground that the party ought to be left to his remedy at law.  It is very true that if we look at this case as involving merely the naked question of a title to land claimed under a deed, and for the ordinary account of mesne profits, the courts of law furnish not only the appropriate but the exclusive forum for its settlement.  But the bill alleges as a ground of re-lief that the deed in question was in the nature of a family set-tlement—a provision made by the grandfather for the grandson before his second marriage, upon the faith of which other con-nexions of the family had acted in the distribution of their prop-erty; and a serious question of fraud is raised in the answer in respect to it, both of which are questions proper for a court of equity.  And besides this, the defendants, instead of demurring

to the bill for want of equity, or pleading to the jurisdiction of the Court, have so far submitted to it as to put in answer, take testimony and go to the hearing upon the merits. And although undoubtedly the question of jurisdiction may be raised by way of answer, and such question was so raised here, yet, I think, clearly, as the case stood, it ought to have been decided upon the merits. And as this Court, on this appeal, has the whole case before it and may make such order as the Chancellor ought to have made upon the hearing, I proceed to examine the next question proposed, to wit :

2. Is the complainant entitled to the relief he prays ?

He claims the premises in question under a deed drawn in the usual form of a deed of bargain and sale, proved to be in the handwriting of Anthony Woodward, to the complainant, his grandson, and signed and sealed by the grantor in the presence of two witnesses, conveying to him, the said Alfred Woodward, the homestead farm by metes and bounds, for the consideration of four hundred dollars. Laying out of the question the allegation made in the bill, denied in the answer and not proved, of a personal delivery of this deed to Alfred, the case stands as follows upon the material facts in the pleadings and proof :

The complainant was brought up from the age of about four years by his grandfather and educated. The grandmother died in 1822, and on the 23d August, 1825, Anthony Woodward married his second wife, Caroline, one of the defendants.

Isaac N. Woodward, one of the subscribing witnesses to the deed, testifies that a few days before his second marriage Anthony Woodward came to Moses Irvin's store, at Prospertown, and after talking sometime passed to the other side of the counter and took a paper out of his pocket, laid it on the counter, and then took out a newspaper and partly opened it and laid it over the written part of the paper, and then spoke to witness and one Smith and asked them if they would witness his signing to it. He signed and acknowledged it to be his hand and seal for the uses and purposes therein mentioned ; and then Smith and witness witnessed it. He then folded up the newspaper and the paper they signed and put them in his pocket again, talked

some time and went home.    Witness didn't know what the paper·
was; nothing was said about delivering it, nor was any money
paid.    Alfred's name was not mentioned.    This is all that ap-
pears in relation to the execution of the deed, except that Smith,.
the other witness, when called to prove the deed after the de-
cease of Anthony, swore that he saw him sign and seal it as his
voluntary act and deed.

We have then the testimony of several witnesses as to conver-
sation had with Anthony.    *Tallman* says that before Anthony's
second marriage he told him he was going to leave Alfred the
farm, and that he said pretty much the same thing at other times,
but not after the marriage.    *Stout* testifies that in 1838 he told
him that Alfred had a deed for the farm; that it was in the
desk.    He said this in the presence of his daughter Elizabeth at
his own house, and that Caroline, his wife, was not far from him
when he said it.    Witness does not undertake to give the precise·
language used.    *Camp* says one day when he was chopping in
Anthony's woods, which is a part of the farm, in 1836, An-
thony came to him.    Witness said, "this is a pretty woods,"
and he replied, " yes—it will be Alfred's."    *Homer* says, that,
upon the marriage he thinks he heard Anthony on one occasion
tell Samuel Throp he had either willed or deeded his place to
Alfred.    *Dorothy Kennedy* says that before the marriage she
was at Anthony's to tea, and that discoursing about wills he·
told her what he should do if he married a second wife; it would·
be his will, he said, that what he and his first wife had got to-
gether should be left to his first wife's children—it would be·
right and what he should do ; and what he and his second wife·
got together should be for his second wife's children; that would
be what he should do and what was right if he ever married a
second wife ; and that Caroline was present at this conversation.
There is evidence also that Joseph Bullock, the maternal grand-
father of. Alfred, in 1827 altered his will, and reduced a legacy·
to Alfred from $1,000 or $1200 to $100, under the expectation ·
that Alfred would get his grandfather Woodward's farm.

The deed, as we have seen, bears date on the 19th August,
1825.    There is no evidence, except what complainant himself

said, that it was ever out of Anthony Woodward's possession, or indeed that it was ever seen by any body, after it was signed, during his life time.   He died on the 9th May, 1840, and on the 29th of the same month, when the administrators and apprais-ers were engaged in making the appraisement at the mansion house, it was found in a private drawer in the desk of the de-ceased, with other papers.   Alfred, who was present, took hold of it, looked at it, said it was his deed, or the deed he had been looking for, or what he expected to see, or words to that effect. Caroline was called in by him, and Judge Lawrence then read the deed, laid it down, and Alfred took it up and put it in his pocket.   When asked at the time whether he had ever had pos-session of that deed from his grandfather he said " no ;" he said his grandfather had. showed, or read it to him in the furnace house.   He said he expected he might have had it, but he was going away to school and did not care to take it with him, or something like that.    He said he had not paid anything, but he expected, or his grandfather said he was going to give him the farm.   This is substantially the case made by the complainant.

1. The defendants insist that this instrument was not in the nature of a family settlement, and is not within the rules of equity which govern such settlements.   And I think this must be conceded : 1. Because the deed itself does not purport to be such upon its face ; it is in the ordinary form of a deed of bar-gain and sale.   If it had been intended as a family settlement it would, I think, have contained something to convey such an idea ; at any rate we have no right to presume anything with-out evidence, contrary to the plain words of the instrument.    2. The deed calls for a money consideration, greatly below the value it is true, but still it seems to me we are not at liberty to say that this particular sum, this $400 of consideration money, was not inserted for some unexplained purpose.   And 3. It nowhere appears that Anthony Woodward in his life time ever, in public or in private, declared this deed to be a deed of settlement, and a Court of Chancery will not assume that a deed of bargain and sale upon its face is a settlement deed, without conclusive evidence that it was intended as such.

2. Then is it good as a deed of bargain and sale? The objection is that it never was delivered; that the consideration money was never paid; that Anthony Woodward never had a present intention to consummate and complete the act, and never did so. That there was no manual delivery and no money paid must be assumed as true. The complainant has failed to prove an actual delivery by competent evidence; he admits there was no payment. The question of *intention* remains.

The law is well settled. There is no precise or set form in which a delivery must be made. A deed may be delivered by words without acts, or by acts without words, or by both acts and words. After a writing has been signed and sealed, an *intent*, coupled with acts or words evincing such intent to consummate and complete it, and to part absolutely and unconditionally with it and the right over it, is sufficient to give it legal existence as a deed. *Foley v. Van Teuyl*, 4 *Halsted* 158; *Shep. Touch.* 58; *Shelton's Case Croke Eliz.* 7; *Hollingsworth v. Arcue, Croke Eliz.* 356; *Coke Lit.* 36a.; *Goodright v. Straham, Cowper* 201; *Goodrich v. Walker*, 1 *Johns. Cas.* 253. And the books are full of cases to the same effect.

But the *intention* must clearly and satisfactorily appear. It is hardly necessary to cite authorities for so plain a principle. It runs through all the cases on the subject. *Smith v. Moor's ex'rs*, 3 *Green's Ch. R.* 485, and *Crawford v. Bertholf* and *al*, *Saxton* 467, are to this effect. In *Lord v. Bennett*, 8 *Car.* and *Payne* 124, the intent was deduced from the formal execution of the deed and its delivery by the grantor to a third person for the grantee, by the jury to whom the question was submitted. In *Woodbury & Minot's R.* 326, the intention to deliver was abundantly clear; there was a deed from father to son, a lease from the son of the premises to the father for life, and the papers deposited with a third person. So 6 *Barn & Cress* 668, *Doe v. Knight* was the case of a mortgage executed and deposited with a third person. In the case of *Eaton v. Scott*, 6 *Simms* 32, one Hampton executed a mortgage to Filmer and Gilpin for £5,000 to secure certain trust monies in his hands, and it took effect as against other creditors, though

there was no *manual* delivery. No question was or could be made here as to the *intention* of the mortgagor—that was clear. *Somerby v. Arden* 1 *John Ch.* 239 was the case of deeds made to trustees upon certain trusts, for the use of his daughter, signed, sealed, acknowledged, and after some time delivered to one of the trustees in presence of *cestui que trust*, with some verbal explanation of the intent of the grantors by way of annexing conditions to the grant, to which the *cestui que trust* did not accede. Before the deeds were delivered to the trustees they had been handed to the mother for the daughters; and the Court held that there was evidence of a full and absolute delivery, even before the delivery to the trustees. The case of *Jane v. Burg*, 2 *Dyer* 167 *b.* was the case of an actual delivery to a third party; and *Alford's* case in 2 *Leonard* is to the same effect. *Clavering v. Clavering* 2 *Vernon* 473 was a deed of settlement in trust; and so are many of the cases cited; and in such cases it has undoubtedly often been held that no actual delivery is necessary; that the intent is sufficiently manifested by the formal execution of the instrument. But in cases other than deeds of settlement the authorities all concur that there must be a delivery, or some act equivalent to a delivery, or a clear *intention* on the part of the grantor, coupled with acts or words *evincing such intent*, to consummate and complete the transaction, and to part absolutely and unconditionally with the right.

Looking to what was *done* by Anthony Woodward significant of his intention to convey the farm to the complainant, the evidence goes no further than the mere drawing, sealing and signing of the deed as a private paper kept by himself, ready for delivery when, if ever, he should make up his mind to deliver it.

Nor when we examine the evidence as to what he *said*, are we at all relieved of the doubt as to what his intentions were. The testimony of complainant's witnesses is as to remarks or conversations many years before the period when they were called to testify. The witnesses were examined in 1849. Tallman speaks of a conversation in 1825; Stout in 1838; Camp in 1836; Horner in 1825, and Dorothy Kennedy in 1825; and of these witnesses nobody but Stout speaks with any positiveness as to

Anthony's saying he had actually made a deed to Alfred, and that it was in his desk. And any one may conceive how easily Mr. Stout may, 9 years after such a deed *was found* in that desk, have *imagined* he had heard the fact from Anthony. Evidence of this kind is too vague, loose and unreliable to authorize a court of equity to say that it supplies what is wanting here—evidence that at the signing of the deed the intent to deliver was coupled with the act.

And if we turn from these considerations to the *circumstances*, our doubts are rather increased than dissipated. Looking to the domestic relations of Anthony Woodward *anterior* to his second marriage, it is easy to perceive reasons why be should be disposed to give his homestead farm *eventually* to Alfred. He had but one son, to whom he had made already a considerable advance out of his estate. This was his only grandson, and had been cast upon him at an early age by unhappy differences between his parents ; he had brought him up and was educating him for a profession; it was natural enough he should regard him, *then, as his ultimate heir.* And when the old gentleman was about to consummate a second marriage, considerations were present which were calculated to turn his thoughts and feelings in the same direction. There is enough in the case to warrant the supposition that he did, *then,* entertain serious thoughts of giving a deed to Alfred, for the farm, at some future time ; and that he prepared it in order that it might be ready when the time came for its delivery. But his circumstances changed; his marriage seems to have proved a happy one ; a family of young children grew up around him, to whom he appears to have been tenderly attached ; to one of his young sons bearing his own name he sometimes spoke of an intention to leave him the old homestead ; and I can much more easily conceive that with these changing circumstances came a change of purpose, and that the old deed, long laid aside, was in the end forgotten by him, than I can conceive that, faithless to the natural affections of the heart, to the duties and obligations of a husband and father, he intended that this secret deed, after his death, should operate to disinherit

his family, and pass nearly, if not the whole, of his property to a grandson, for whom he had already done much.

Besides all this the case made in the complainant's bill has in it some remarkable peculiarities. His allegation is that this deed was made, executed and delivered in August, 1825; that the absolute title then passed from Anthony Woodward to himself. He says the deed was delivered to him without condition, or limitation; and that he permitted the said Anthony to continue in the occupation and enjoyment of said farm as he had been prior thereto. And it is very clear that as this case stands upon the bill, the answers and the proof, if the title passed at all to the complainant it passed at the time he alleges. If there ever was a legal delivery it was then; if the intention was ever carried into effect so as to complete and validate the transaction it was then. And yet the conduct of the parties, that which is the best exposition of the intention on one side and the understanding on the other gravely conflicts with this theory. The act was completed on the 20th or 21st of August 1825; the title passed out of Anthony Woodward; this large estate became absolutely vested in fee simple in Alfred; no lease for life stipulated for by the grandfather, not even a verbal stipulation for a tenancy at will; no agreement or request that the thing should be kept secret; and yet the whole transaction is buried for fifteen years almost in the silence of the grave. No deed put on record or exhibited to a living eye; no change of possession; no claim of right: and nothing left after 15 years, but the deed found among the old papers of the grantor, and the vague recollection of scraps of casual conversations such as it is detailed after many years had passed, by some three or four witnesses. It seems to me improbable that Anthony Woodward should have thus placed himself at the mercy of even his grandson; incredible, if he did so, that the fact should have been so long concealed from the inquisitive eye and ear of the neighbors.

Upon the defendant's theory there is nothing incredible. It is natural enough to suppose that the old gentleman had, before his second marriage, and up to the period of it, thought of conveying this farm to his grandson; that he prepared this deed

and signed it in the presence of witnesses, concealing the character of the instrument from them, and then put it in his desk to await his final resolution, supposing until certainly delivered it was as harmless as waste paper, and that, as he never did deliver it he never fully formed the intention ; never determined to give it vitality. With this theory all the facts proved in the case harmonize much better than with any other.

It is a question of intention. There is no case which holds that the mere act of drawing, signing and sealing a deed without delivery or a present intention to deliver, without the mind to complete the act, ever passed the title to an estate.

I am of opinion the decree of the Chancellor was right, though not for the reason he assigns, and that there should be an affirmance on the merits.

The decree of the Chancellor was affirmed.

For affirmance, Justices HAINES, POTTS, ELMER and OGDEN ; and Judges RISLEY, SCHENCK, VALENTINE and WILLS.

For reversal, Judges ARROWSMITH and CORNELISON.